## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SIMEON MLADENOV,

Plaintiff,

v.

R1 RCM INC., d/b/a MEDICAL
FINANCIAL SOLUTIONS,

Defendant.

Case No. 21-cv-1509

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Simeon Mladenov sued Defendant R1 RCM Inc. for sending statements that did not comply with disclosures required by the Fair Debt Collection Practices Act. [21]. Before the Court now is R1 RCM's motion for summary judgment, [48], which revolves around whether R1 RCM is a debt collector covered by the Act. For the reasons stated below, R1 RCM's motion for summary judgment [48] is granted as a matter of law.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the

1

adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## BACKGROUND

### I.    Facts[1]

On August 10, 2020, Mladenov was rear-ended by an individual named Tara Larke. DSOF ¶ 1; PSAF ¶ 46. He suffered injuries from the accident to his lower back, spine, and neck that required medical treatment. DSOF ¶ 1, PSAF ¶ 45. Mladenov underwent subsequent treatment at Amita Health Saint Joseph hospital, accruing

---

[1] These facts are taken from Defendant R1's Rule 56.1 statements of fact [50] (DSOF), Plaintiff's response to Defendant's statement of facts, [55] (PSROF), Plaintiff's statements of additional facts [55] (PSAF), and Defendant's response to Plaintiff's statement of additional facts (DSRAF) [56]. The facts are undisputed unless otherwise noted.

2

$1,406.00 in hospital bills. DSOF ¶ 2; PSAF ¶ 51. After adjustments by the hospital, Mladenov owed a balance of $562.40 to Amita Health. DSOF ¶ 27.

Mladenov first received at least one letter directly from Amita regarding his unpaid balance. PSAF ¶ 39. Amita then referred his account to R1 RCM for billing services. DSOF ¶ 3. R1 RCM services hospitals throughout revenue cycles, *id.* ¶ 4, and accordingly acts "as an extension of Amita to service patient accounts." *Id.* ¶12.[2] In this capacity, R1 RCM also performs "early out" pre-collection services to resolve unpaid accounts before they are deemed bad debt. *Id.*

On December 27, 2020, R1 RCM sent a statement to Mladenov at his home address in Chicago. DSOF ¶ 20; PSAF ¶ 32, 33. The statement explained that Mladenov had an "active balance of $562.40 with AMITA Health" that was sent to Medical Financial Solutions "to assist [him] in resolving this balance." DSOF ¶27. The statement further read, "[t]he amount due of $562.40 is not currently in default but it is very important that we hear from you." *Id.* At the bottom of the statement was a notation in smaller font that read:

> Unless you notify Medical Financial Solutions within 30 days of receiving this notice that you dispute the validity of the amount owed, or any portion thereof, we will assume the amount owed to be valid. If you notify Medical Financial Solutions in writing within the 30-day period that you are disputing this amount owed, we will provide you with verification of your outstanding balance via U.S. mail service.

---

[2] R1's full slate of services to Amita are on the "front-end" (patient registration, verifying insurance eligibility, and pre-payment), in the "middle" of the cycle (record retention, auditing codes and charges on bills), and at the "back end" (post-service billing, payment processing, addressing insurance denials, release of records, and coordinating debt collection with third-party agencies). DSOF ¶¶ 6-11.

PSAF ¶ 67. The statement also includes red boxes at the top and bottom of the page with bolded all-caps the phrases "PAYMENT DUE" and "PAY THIS AMOUNT," as well as a ledger of costs, instructions on how pay the balance to Amita, a letter explaining the hospital's partnership with R1 RCM, and ways to seek financial assistance. *Id.* ¶ 64; DSOF ¶20 (D Ex. B-2).

After receiving this first statement from R1 RCM, Mladenov contacted his attorney to protect him from "intrusions" while he recovered from his injuries. PSAF ¶ 54. On January 7, 2021, Mladenov's attorney sent R1 RCM two letters informing the agency that Mladenov retained legal counsel in connection to the car accident and had a claim pending against Tara Larke, the other individual involved in the accident. DSOF ¶¶ 22-24. Mladenov's attorney advised R1 RCM to cease its communications with Mladenov. *Id.*

Despite the letter from Mladenov's attorney, on January 26, 2021, R1 RCM sent a follow-up statement to Mladenov's home. *Id.* at ¶ 26. The second statement was largely identical to the December 27 statement, except for new text that read: "a balance of $562.40 with AMITA Health that is due and is now with Medical Financial Solutions to determine how [the] matter can be resolved." *Id.* at ¶ 27. The January 26 statement repeated the earlier assurance that "[t]he amount due of $562.40 is not currently in default but it is very important that we hear from you." *Id.*

The January 26 statement caused Mladenov "tremendous amounts" of stress and panic. PSAF ¶¶ 59, 66. He assumed that the content and appearance

of the statement (its red color, payment due date notation, and the fact that R1 RCM, not Amita, sent the statement to him twice) meant that the debt was in default and required urgent attention. *Id.* at ¶ 65. Mladenov lost his appetite, sleep, and trust and confidence in his attorney. *Id.* He also fretted over his ability to pay the bills and borrowed $1,000 from a friend to resolve the balance. *Id.* at ¶¶ 61-63. He ultimately repaid those borrowed funds with interest. *Id.*

R1 RCM's Master Professional Services Agreement with Amita Health details the full scope of services provided by R1 RCM. As a part of its "back-end" services, the agreement authorizes R1 RCM to manage patients' "bad debt through internal means and/or third-party vendors." DSOF ¶ 4-6, 12; PSAF ¶ 40. R1 RCM is registered as a debt collection agency in the state of Illinois. PSAF ¶ 44. However, Karly Wagner, R1 RCM's director of patient facing shared services and records custodian, swore an affidavit in which she stated that R1 RCM does not itself make determination of whether Amita patients' accounts are in default, nor does it collect on defaulted accounts. DSOF ¶ 13, 17. Instead, Amita decides to write off accounts as defaulted, then R1 RCM outsources the bad debt management to third-party collectors. *Id.* ¶ 17, 18. According to Wagner, Mladenov's account "was not in default at any point" when R1 RCM sought to resolve the balance with pre-collection services. *Id.* ¶29-30.

On March 18, 2021, Mladenov filed suit against R1 RCM for damages under the FDCPA, 15 U.S.C. §1692c. R1 RCM moved to dismiss the suit for

lack of standing, which the Court granted with leave to amend. [20]. Mladenov

filed an amended complaint on February 8, 2022. [21]. The amended complaint

pleads two violations of the FDCPA: direct communication with a consumer

represented by counsel as prohibited by 15 U.S.C. § 1692c (Count I), and false,

deceptive, or misleading representation to a consumer under 15 U.S.C. §1692e

(Count II). R1 RCM moves for summary judgments on both counts.

## ANALYSIS

R1 RCM asserts that it is not a "debt collector" under the FDCPA, arguing that

that neither Amita Health nor R1 RCM treated Mladenov's debt as in default when

his account was assigned to R1 RCM. Mladenov responds that the cumulative effect

of R1 RCM's correspondence reasonably led him to believe his debt was in default.

For the reasons explained below, the Court agrees that R1 RCM is not a debt collector

as defined by the FDCPA.

### I. Whether R1 RCM is a covered debt collector depends on whether the debt was in default

The FDCPA requires debt collectors to make certain disclosures in their attempts

to collect debts that are in default so that consumers have "information that helps

[them] to choose intelligently." *Hahn v. Triumph Partnerships LLC*, 557 F.3d 755,

757 (7th Cir. 2009). However, the Act only applies to "debt collectors," as opposed to

creditors. 15 U.S.C. § 1692k; *see Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534,

536 (7th Cir. 2003). Whether a party is a debt collector depends on the asserted status

of the debt in question. *Id.* The FDCPA definition of "debt collector" excludes "any

person collecting or attempting to collect any debt owed . . . which was not in default

at the time that it was obtained by such person." 15 U.S.C. § 1692a(6)(F). The statute does not, however, define when a debt is "in default."

Courts thus make determinations of default on a case-by-case basis. *Palacio v. Med. Fin. Sols.*, 21 CV 1288, 2022 WL 2132505, at *5 (N.D. Ill. June 14, 2022) (collecting cases). For example, an overdue debt is not necessarily immediately in default. *Alibrandi v. Financial Outsourcing Servs., Inc.*, 333 F.3d 82, 87 (2nd Cir. 2003). When, as here, the original creditor assigns debt to a third party, courts ask whether "the debt was in default at the time it was acquired." *Ruth v. Triumph Partnerships*, 577 F.3d 790, 796 (7th Cir. 2009); *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003); *Church v. Accretive Health, Inc.*, CV 14-0057-WS-B, 2015 WL 7572338 (S.D. Ala. Nov. 24, 2015), at *8, *aff'd*, 654 Fed. Appx. 990 (11th Cir. 2016). "Thus, if the debt at issue was not in default at the time it was obtained by a third party agency," the FDCPA does not govern the agency's efforts to collect that debt, "and the FDCPA-mandated disclosures would not be required." *Id.* To decide whether a debt is in default, courts first look to contractual agreements between the debtor, the creditor, and the third-party agency, then any federal or state regulations of similar types of debt, and finally, any guidelines provided by the creditor. *Id* (collecting cases); *Palacio,* 2022 WL 2132505, at *5.

Accordingly, the parties' arguments on summary judgment boil down to a single dispositive question: whether Mladenov's debt was in default at the time it was assigned to R1 RCM. If it was not, then R1 RCM was not acting as a debt collector,

and its communications are not subject to the FDCPA. For the reasons explained below, the Court finds that Mladenov's debt was not in default.

R1 RCM produces a number of uncontroverted statements from Wagner, its records custodian, that show that neither Amita Health nor R1 RCM treated the debt as defaulted at the time of assignment. Amita, not R1 RCM, makes those determinations, and the hospital had not deemed the debt in default when it assigned the account to R1 RCM. DSOF ¶¶ 13, 17, 20, 30. R1 RCM for its part classified the debt as a "current receivable" account not in default. *Id* ¶ 30. R1 RCM's service agreement with Amita Health further clarifies that R1 RCM "acts as an extension of Amita in servicing and billing patient accounts." *Id* ¶ 12. In this capacity, R1 RCM performs "early out" services through which it resolves "balances on unpaid accounts prior to the time that the account is deemed delinquent." *Id*. This practice of pre-collection is supported by the text of the statements R1 RCM sent, which read, "[t]he amount due of $562.40 *is not currently in default* but it is very important that we hear from you." (emphasis added). *Id*. ¶ 27.

Mladenov does not create a genuine dispute of material fact on this issue. In response to evidence that the hospital and R1 RCM did not treat the debt as defaulted, Mladenov gives the same stock answers to 11 of R1 RCM's statements of undisputed facts:

> Defendant is a debt collector. Plaintiff's Account was placed with Defendant for collection services. Exhibit A at ¶¶ 8-12. Furthermore, according to the Master Professional Services Agreement between Defendant and Amita Health, Defendant has the right to manage bad debt through third-party vendors and/or through internal means. See

> Dkt. 51, Master Professional Services Agreement ("MPSA") at pg. R1 RCM_179 – Bad Debt Management Section.

PSROF ¶¶ 12-15, 18-20, 30-31. First, he states (without any supporting record evidence) that R1 is a debt collector. *Id.* Mladenov's citations to his unverified amended complaint "do little, if anything" to show a genuine issue of material fact. *Gross v. Peoples Gas Light & Coke Co.*, 634 F. Supp. 3d 464, 476 (N.D. Ill. 2022) (cleaned up); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 ("[Non-moving parties must] go beyond the pleadings ... [and] designate specific facts showing that there is a genuine issue for trial."). Mladenov's reference to R1 RCM's registration as a collection agency in the state of Illinois is also unavailing. The state's definition of "collection agency" is broader than the definition of "debt collector" under the FDCPA. *See Palacio*, 2022 WL 2132505, at *6 (contrasting definitions).

Next, Mladenov insists that Amita referred his account to R1 RCM for collection services. *E.g.* PSROF ¶ 12. Again, his only citations for these statements are allegations from his amended complaint. *Id.* Even if those allegations were verified, the fact that R1 RCM sought to resolve Mladenov's balance does not prove that the debt crossed the threshold of default, especially as R1 RCM engages in pre-collection services. Finally, Mladenov cites the service agreement between R1 RCM and Amita to argue that R1 RCM "has the right to manage bad debt through third-party vendors and/or internal means." *E.g.* PSROF ¶ 31. Just because R1 RCM can use internal means to resolve defaulted debt, though, does not mean it did so with respect to Mladenov's account. Wagner asserted as much, stating that R1 has a policy of not

collecting on defaulted accounts, instead referring bad debt to third-party collectors. DSOF ¶13. In sum, Mladenov repeatedly refers to blanket statements and policies that allow R1 RCM to collect bad debt to dispute R1 RCM's more specific evidence that it did not actually act as a debt collector here. Mladenov's evidence is too generalized and meager to create a genuine dispute of material fact on this dispositive question.

In fact, two district courts have already credited R1 RCM's account that it provides "early-out" services to resolve unpaid debts prior to default. *Palacio*, 2022 WL 2132505, at *4-*6; *Church v. Accretive Health, Inc.*, 2015 WL 7572338, at *9-*13. Those courts found that the respective plaintiffs' debts were outstanding, but not yet in default. In *Church*, the court elaborated that Accretive Health, R1 RCM's corporate predecessor, worked "hand-in-hand" with the hospital on early-out services, such that it acted "much more akin to an originator (as to whom FDCPA restrictions do not apply) than a debt collector". *Id.* at *11. Mladenov's attempts to distinguish *Palacio* and *Church* ultimately fall short because the undisputed facts remain the same across the cases: R1 RCM performs "early out" services *prior to default* for hospitals, and neither the hospital nor R1 RCM deemed the debt in default at the time of communication with the patient.

## II. Mladenov's reaction to the statements does not make R1 RCM a debt collector.

Mladenov urges this Court to use a different test of whether R1 RCM acted as a debt collector: whether the cumulative effect of the communications from R1 RCM would make any reasonable recipient believe that the debt was in default. Mladenov

10

points to the fact that he received two separate statements from an entity other than Amita Health, the form (bolded text and bright red boxes) and substance (phrases such as "payment due" and "pay this amount") of the statements, and his subsequent actions to remediate the debt to argue that he had reasonable grounds to believe his account was in default. [54] at 4; PSAF ¶¶ 64-65. The Court disagrees.

Mladenov relies on a single district court opinion, *Mavris v. RSI Enterprises*, 86 F.3d 1079 (D. Ariz. 2015), to support his proposed inquiry. *Mavris* is not binding on this Court, nor is it persuasive. In *Mavris*, the court asked whether "a reasonable person in the debtor's position [would] believe that the creditor viewed the debt as in default." *Id.* at 1086. While the Seventh Circuit has not articulated a definitive test of whether a debt is "in default," it typically focuses on the "status of the obligation asserted by the assignee." *Schlosser*, 323 F.3d at 538. That is, to courts in this district, an assertion of the status of the debt by the assignee creditor, not the debtor, is the most important indicator of default.

*Mavris* is also distinguishable based on its more egregious set of facts. There, the hospital threatened to refer the plaintiff's account, which it termed "seriously past due," to a collection agency after 30 days of non-payment. 86 F.3d at 1081. The plaintiff then received a second letter with FDCPA-mandated disclosures from the defendant agency exactly 30 days later. *Id.* The court therefore held that the communications would objectively lead a reasonable recipient to believe their account was in default.

Here, meanwhile, R1 RCM's statements explained that R1 RCM was an Amita partner on patient billing, mitigating Mladenov's fears that a different sender's name appeared on the letterhead. DSOF ¶20 (D Ex. B-2). Mladenov's perception of default is further inconsistent with statements' assurances to the contrary, which read, "[t]he amount due of $562.40 is not currently in default, but it is very important that we hear from you." *Id.* ¶ 27. In the words of the *Mavris* court, then, "even if a debtor has reasonable grounds to believe a creditor views a debt as in default, she will be unable to assert her FDCPA rights unless she also knows that 1) the creditor has transferred the debt to a third party, and 2) that transfer occurred after the creditor began treating the debt as in default." 86 F.3d at 1086. Mladenov had repeated assurances that though his balance was overdue and transferred to R1 RCM, neither Amita nor R1 RCM treated it as in default.

For these reasons, the Court determines that there is no genuine issue of material fact on the question of whether Mladenov's debt was "in default" at the time it was assigned to R1 RCM. Mladenov presents no evidence that controverts R1 RCM's assertion that the debt was not in default, and a reasonable finder of fact could not conclude that the debt was in default. Because Mladenov's account was not in default at the time Amita Health assigned it, R1 RCM does not qualify as an FDCPA-regulated debt collector in relation to Mladenov's account. 15 U.S.C. § 1692a(6)(F)(iii). R1 RCM thus had no obligation to comply with FDCPA disclosures in its communications with Mladenov.

Mladenov accordingly has no basis for his FDCPA claim. The Court grants summary judgment on all claims presented in the Amended Complaint. [48].

## CONCLUSION

For the stated reasons, Defendant R1 RCM's motion for summary judgment [48] is granted. The Clerk is directed to enter judgment in Defendant's favor and against Plaintiff Simeon Mladenov and terminate the case.

E N T E R:

Dated: January 22, 2024

_Mary M Rowland_

MARY M. ROWLAND
United States District Judge

13